# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
Assigned on Briefs October 21, 2014 at Knoxville

## STATE OF TENNESSEE v. JALEEL JOVAN STOVALL

**Appeal from the Circuit Court for Hardeman County**
**No. CC-2011-CR-1011    J. Weber McCraw, Judge**

---

### No. W2013-02553-CCA-R3-CD  -  Filed November 18, 2014

---

The Defendant, Jaleel Jovan Stovall, was convicted by a jury of rape of a child, and the trial court imposed a twenty-five-year sentence at 100% for this conviction. In this direct appeal, the Defendant argues that the evidence is insufficient to support his conviction beyond a reasonable doubt because he was mistaken as to the victim's age. Deeming the evidence sufficient, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and ROBERT L. HOLLOWAY, JR., JJ., joined.

W. Erik Haas, Somerville, Tennessee, for the appellant, Jaleel Jovan Stovall.

Robert E. Cooper, Jr., Attorney General and Reporter; J. Ross Dyer, Senior Counsel; D. Michael Dunavant, District Attorney General; and Joe L. Van Dyke, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION
### FACTUAL BACKGROUND

In May 2011, a Hardeman County grand jury charged the Defendant with rape of a child, eleven-year-old S.F.[1] ("the victim"), a Class A felony. See Tenn. Code Ann. § 39-13-522. The Defendant thereafter entered a guilty plea to rape but was later allowed to withdraw that plea, and he proceeded to trial in January 2013.

---

[1] It is the policy of this court to refer to minor victims by their initials only.

At trial, Kevin Crawford, City of Galloway Chief of Police,[2] testified that he received a call on June 17, 2010, from the Hardeman County Community Health Center that a female juvenile had a positive pregnancy test. He arrived at the center and spoke with S.F., who was eleven years old at that time, and her mother, V.F.[3] After talking with them, Chief Crawford "determined that [the victim] had had sexual contact with an individual that was staying temporarily at [the] house and visiting back in April, around the — April 8th, April 9th." The victim identified the then eighteen-year-old Defendant as the man who came into her room during the night and forced her to have sexual intercourse. Chief Crawford set up a forensic interview for the victim.

Chief Crawford then proceeded to locate the Defendant and interviewed him. The Defendant denied any sexual contact with the victim, but he provided Chief Crawford with the following explanation:

> He did admit that he had stayed at the house during the time that [the victim] became pregnant, advised that he does not recall having any sexual contact with her, that he had came (sic) home, had been under the influence of alcohol and marijuana, and that — stated that if she was pregnant by him, that undoubtedly after he passed out that she had taken a turkey baster and got herself pregnant trying to frame him.

The victim testified that the Defendant occasionally spent the night at her house during the early months of 2010. The victim said that her family was having a barbecue at the house one day, that the Defendant was walking around the neighborhood alone, so her mother's boyfriend invited him over, and that the Defendant then began "hanging" around their house. According to S.F., approximately one month later, the Defendant came into her room at night, hit her in the ear, and told her that, if she said anything, then he would hurt her. The Defendant forced her to have sex with him. According to the victim, the Defendant did not appear intoxicated on this evening. The victim acknowledged that she did not tell anyone about the incident until her positive pregnancy test.

The victim stated that the Defendant knew she was only eleven years old, describing, "I got off the bus one day, doing my homework. He saw the grade on my book, . . . and he asked me how old was I and I told him 11." Morever, the victim said that she did not have any type of relationship with the Defendant and confirmed that her baby was born on December 14, 2010.

---

[2] At the time Chief Crawford worked on this case, he was an officer with the Bolivar Police Department.

[3] In furtherance of our effort to protect the victim's identity, we will also refer to her mother by her initials.

According to the victim, the Defendant called her house after his arrest and wrote her letters. One letter, admitted into evidence, read as follows:

> I know that we haven't talked in a while but I just want to let you know that you and my daughter stay in my thoughts. I just want to tell you that we can be a family if you let us be. I want to be there for you and my daughter. So please when my trial date comes around don't even show up. And if they come to your house to try to serve you a subpoena don't even answer the door. I know that you know my whole name so please send me some pictures of my daughter please. I am back at the county jail so you should have the address. Well, hopefully you'll do all these things for me so that we can be a family once again. J

The victim's mother's testimony provided many of the same details. Importantly, her mother, V.F., stated that she "let it be known when [the Defendant] first started coming around how old [the victim] was [and] what grade [the victim] was in . . . ." V.F. testified further that the Defendant was with her at times when the victim got off of the school bus and that the Defendant helped the victim with her homework a couple of times. V.F. confirmed that the Defendant occasionally stayed at her house as an overnight guest, although he lied to her that he had been locked out of the house where he was staying in order to secure an invitation. On the occasions when the Defendant slept on her couch, the Defendant did not appear under the influence of drugs or alcohol according to V.F.

In the spring and summer of 2010, V.F. noticed the victim's behavior start to change. V.F. described this change as follows:

> She went crazy, to be, you know — I mean, she started cutting on herself. She would wake up through the night hollering and screaming. She'd take baths five or six times a day, like, you know, something that she was just nasty. She would take baths constant[ly] from the time she'd get — if she got up in the morn — that night to take a bath for school, she'd get up in the morning and take a bath. When she got out of school, she was constantly just washing herself. She started cutting her wrists. She was jumping up out of her sleep, speaking in tongue[s]. . . . When she woke up, her eyes were wobbling in the back of her head and she'd be hollering and screaming and crying.

V.F. opined that this behavior change happened after the alleged rape. V.F. further described incidents where someone would knock on the door, and the victim would say to her that if it was the Defendant, then do not let him in. V.F. sought assistance for the victim's mental health issues.

3

The victim was fifteen weeks pregnant by the time she received a physical examination. Paternity testing was later done, and according to those results, the probability that the Defendant was the father of the victim's child was 99.999998%.

The Defendant, whose date of birth was March 10, 1992, testified on his behalf. He stated that, after being released from juvenile detention in Madison, Wisconsin, he came to stay with his uncle in Hardeman County in the spring of 2010. According to the Defendant, he met the victim approximately two to three weeks after his arrival. He claimed that, in the month or so that followed, he and the victim developed a romantic relationship, that the victim told him she was seventeen years old, and that the victim's mother confirmed her age. The Defendant was shown a photograph of the victim taken around the time of the alleged rape, which had previously been admitted into evidence, and the Defendant opined that she did in fact look seventeen in the photograph. The Defendant denied that he ever helped the victim with her homework.

The Defendant admitted that he had sexual intercourse with the victim but denied that he ever hit the victim or forced himself on her, and he stated that he continued to visit the family regularly after the alleged rape. As for his untrue statements to Chief Crawford, the Defendant explained that he felt intimidated and was "highly confused" at that time. The Defendant also admitted that he phoned the victim from jail on several occasions and that he had spoken with the victim. As for the letter previously admitted into evidence, the Defendant acknowledged that the letter did express his actual feelings, but he denied authoring the letter.

The jury found the Defendant guilty as charged. The trial court sentenced him to a term of twenty-five years at 100%. The Defendant filed a timely notice of appeal, challenging the sufficiency of the evidence supporting his conviction.

ANALYSIS

An appellate court's standard of review when a defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). This court does not reweigh the evidence; rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

4

A guilty verdict "removes the presumption of innocence and replaces it with a presumption of guilt, and [on appeal] the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Id.; State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). "This [standard] applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of [both] direct and circumstantial evidence." State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). The standard of proof is the same, whether the evidence is direct or circumstantial. State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011). Likewise, appellate review of the convicting evidence "is the same whether the conviction is based upon direct or circumstantial evidence." Id. (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)). The duty of this court "on appeal of a conviction is not to contemplate all plausible inferences in the [d]efendant's favor, but to draw all reasonable inferences from the evidence in favor of the State." State v. Sisk, 343 S.W.3d 60, 67 (Tenn. 2011).

Tennessee Code Annotated section 39-13-522(a) provides that "[r]ape of a child is the unlawful sexual penetration of a victim by the defendant . . . if the victim is more than three (3) years of age but less than thirteen (13) years of age." "'Sexual penetration' means sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's, the defendant's, or any other person's body, but emission of semen is not required." Tenn. Code Ann. § 39-13-501(7).

In essence, the Defendant's sufficiency argument is that there was no proof that he acted knowingly or recklessly with regard to the victim's age and, therefore, that the evidence was insufficient to support his conviction. In support of this contention, he cites to testimony that he and the victim had developed a relationship, that the victim and her mother had misrepresented the victim's age, that he was permitted to continue to socialize with the family after the alleged rape, and that the alleged rape was not reported for some months.

However, as cited by the State, Tennessee Code Annotated section 39-11-502(a) specifically provides that ignorance or mistake of fact is no defense to prosecution for rape of a child. Therefore, the Defendant's knowledge about the victim's age, a circumstance surrounding the conduct, did not establish a defense to the crime. See State v. Boccous McGill, Jr. and Darius Lacy, No. M2013-01076-CCA-R3-CD, 2014 WL 1413875, at *6 (Tenn. Crim. App. Apr. 11, 2014). Second, the proof in this case established that Defendant had sex with the eleven-year-old victim, the Defendant admitted to sexual intercourse, and a child resulted from this act. Moreover, both the victim and her mother testified that the Defendant was informed of the victim's age, and the jury, as was its prerogative, obviously credited this testimony. We agree with the State that the evidence, viewed in the light most favorable to the State, was sufficient to establish beyond a reasonable doubt that the

Defendant was guilty of rape of child, including the essential element that the Defendant acted recklessly, at the very least,[4] with respect to the victim's age.

## CONCLUSION

In sum, we conclude that the evidence was sufficient to support the conviction. Accordingly, we affirm the judgment of the trial court.

_____
D. KELLY THOMAS, JR., JUDGE

[4] The victim's age element in the offense of child rape is a circumstance surrounding the conduct and, thus, may be satisfied by the culpable mental states of "knowing" or "reckless." See State v. Chester Wayne Walters, No. M2003-03019-CCA-R3-CD, 2004 WL 2726034, at *13 (Tenn. Crim. App. Nov. 30, 2004) (citing State v. Deji A. Ogundiya, No. M2002-03099-CCA-R3-CD, 2004 WL 315138, at *6 (Tenn. Crim. App. Feb. 19, 2004)).